# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00319-CV

---

**William Cyree, Appellant**

**v.**

**Kimberley Kay Cyree, Appellee**

---

### FROM THE COUNTY COURT AT LAW NO. 3 OF WILLIAMSON COUNTY
### NO. 20-0658-FC3, THE HONORABLE DOUG ARNOLD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

William Cyree appeals the trial court's final decree of divorce dissolving his marriage with Kimberley Kay Cyree.[1]  In four issues,[2] William complains about the trial court's disproportionate division of the community assets and debts in favor of Kimberley.  For the following reasons, we affirm the trial court's final decree.

## BACKGROUND

The parties married in 1994 and had three children during their 27-year marriage. Around November 2, 2019, William admitted to Kimberley that he was having an extramarital relationship with one of her friends.  The parties separated, and William moved from the marital home to the friend's home.

---

[1] Because the parties have the same last name, we refer to them by their first names.

[2] William refers to his four issues with the letters A, B, C, and D.

In February 2020, William petitioned for divorce on the ground of insupportability, and in March 2020, Kimberley counterpetitioned for divorce on the grounds of insupportability, cruelty, and adultery. *See* Tex. Fam. Code §§ 6.001–.007. She sought a disproportionate share of the parties' community estate for the following reasons: (a) William's fault in the marriage's breakup; (b) benefits she, as the innocent spouse, may have derived from the continuation of their marriage; (c) their disparity of earning power and ability to support themselves; (d) their education and future employability; (e) "community indebtedness and liabilities"; (f) their "earning power, business opportunities, capacities, and abilities"; (g) their needs for future support; (h) the nature of their community property; (i) William's "wasting of community assets"; (j) their gifts during the marriage; and (k) attorney's fees paid. *See Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981). Kimberley also sought post-divorce spousal maintenance for a reasonable time. *See* Tex. Fam. Code §§ 8.051–.062.

The case proceeded to a final hearing in October 2020. The witnesses were William and Kimberley. At that time, the parties' three children were adults, with the youngest living with Kimberley in the marital home while William was living with the friend. The main issues before the trial court were the value of the marital home, Kimberley's request for post-divorce spousal maintenance, the allocation of debt, and the parties' dog Luke. The exhibits at trial included proposed divisions of the parties' estate, proposed support decisions, and credit card statements for two credit cards in William's name. The evidence showed that the aggregate balance on the two credit cards was about $25,000. As to the parties' other credit cards, each had one with a balance of about $1,500, and there was a contingent debt of approximately $14,000 for their children's student loans.

Kimberley testified that the marriage deteriorated when William "started a relationship with her friend"; that on November 2, 2019, William admitted to the relationship when Kimberley confronted him about it; and that he "moved out shortly after that." In his testimony, William admitted to the extramarital relationship with Kimberley's friend, but he testified that he had not dated the friend for an extended time. When he moved out of the marital home, he moved in with the friend. He did not take their dog Luke with him, but on the day that he filed for divorce in February 2020 and without notice to Kimberley, he picked up Luke and other items from the marital home while she was at work. He also cancelled Kimberley's mobile phone plan and removed her as an authorized user on his credit cards.

Concerning the parties' current income, education, and living expenses, William testified that he worked as an "audio, video design engineer," earning approximately $85,000 annually and taking home approximately $5,585 per month after withholding, and that he had an associate degree "as a computer technician." After the parties' separation, the evidence showed that William charged more than $5,000 per month on the two credit cards. William testified that the charges were for living expenses, such as insurance costs, gym memberships, food, and recurring bills.[3] He testified that he had not paid rent since moving into the friend's home but that beginning in April 2020, he was under "a promissory note" to pay $1,000 per month for rent.

---

[3] During cross-examination, William was asked about his monthly charges after the parties' separation on the two credit cards:

Q. Okay. So between those two credit cards, you're charging almost $6,000 a month for living expenses, allegedly?

A. Yeah. It sounds a little more than I think it is. I don't know why.

In its findings of fact, the trial court found that William's monthly living expenses were roughly equal to his monthly income.

Kimberley testified that she was working as a service cashier, earning $14 per hour, which was approximately $30,000 annually. She was taking college classes through a program that her employer offered, and if she maintained her current course load, she would obtain her degree in three years. She had obtained her real estate license in 2014, earning approximately $15,350 in 2016 and $5,209 in 2017 but losing $2,718 in 2018, explaining that "fees for real estate are quite steep." She testified that after the parties' separation, she was not making enough money to meet her daily needs and had decreased her spending, including not going out or buying clothes. The evidence showed that her credit card, which had an outstanding balance of around $1,500, had a credit limit of $3,750.

The parties' primary asset was the marital home. The home had two mortgages totally approximately $180,000. After the parties' separation, William had been making the monthly mortgage payment. As to the home's value, William testified that it was "a little bit of a fixer upper" with repairs needed, including to the roof and windows, and "a good paint job." He testified that if the home was "in good condition and sold at high market value," it would be worth $285,000, but he agreed that its fair market value was $240,000 less transaction costs and fix-up costs.[4] Kimberley, who testified after William, testified that the valuation of the home "that was put forth earlier was pretty true and correct except for the repairs that need to be done." She testified that in addition to the repairs that William testified about, there were projects that had been started but not completed, including a balcony "that was torn down and not replaced"

---

[4] The trial court questioned William about the value of the marital home as follows:

[William]:      That's the value I'm claiming, is about $240—
The Court:     So you'd agree with that, though—$240—?
[William]:      I do, sir.
The Court:     Okay. Minus transaction costs and fix-up costs.
[William]:      Right. Correct.

4

and "doors that open onto a drop-off, which is a health and safety concern." She testified that it would cost "probably about $15,000" to repair the home to make it marketable and that if all the repairs on the home were made and it was sold, after closing costs, there was not going to be much left over. She hoped to continue living in the marital home and requested that the trial court award it to her in its property division.

In the final decree of divorce, the trial court did not award Kimberley post-divorce spousal maintenance but awarded her a disproportionate share of the community estate. Kimberley was awarded the marital home and assigned its corresponding debt. William was awarded their dog Luke and $12,500, "representing 50 percent of the equity in the marital residence," payable to him from Kimberley and secured by an owelty lien on the marital home. Kimberley was ordered to refinance the mortgages before May 31, 2021, or if she was unable to refinance, to list the home for sale on or before July 1, 2021. William was assigned the debt on the two credit cards and the contingent debt of their children's student loans, and each party was assigned the debt on their respective cards with balances of approximately $1,500. The trial court also entered findings of fact and conclusions of law. This appeal followed.

## ANALYSIS

In four issues, William challenges the disproportionate division of the community estate, raising arguments based on no-fault divorce, spousal maintenance, the equity in the marital home, and the meaning of "just and right" or "equitable" property division.

### Standard of Review and Applicable Law

We review a trial court's division of the marital estate for abuse of discretion, and the trial court has broad discretion in making this division. *See Penick v. Penick*, 783 S.W.2d 194,

5

198 (Tex. 1988); *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.) (*O'Carolan I*). "To constitute an abuse of discretion, the property division must be manifestly unfair." *O'Carolan I*, 71 S.W.3d at 532 (citing *Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980)). "On appeal, we presume that the trial court exercised this discretion properly and will reverse the cause only where there is a clear abuse of discretion." *Ashraf v. Ashraf*, No. 03-11-00467-CV, 2012 Tex. App. LEXIS 4345, *21 (Tex. App.—Austin May 24, 2012, no pet.) (mem. op.) (citing *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974)). "[T]he appellant bears the burden to show from the record that the division was so disproportionate, and thus unfair, that it constitutes an abuse of discretion." *O'Carolan v. Hopper*, 414 S.W.3d 288, 311 (Tex. App.—Austin 2013, no pet.) (*O'Carolan II*); *see Murff*, 615 S.W.2d at 700 (observing that "[m]athematical precision in dividing property in a divorce is usually not possible" and that "[w]ide latitude and discretion rests in these trial courts and that discretion should only be disturbed in the case of clear abuse").

"Under the abuse of discretion standard, a lack of legally or factually sufficient evidence does not constitute an independent ground for asserting error; instead, it is a relevant factor in determining whether the trial court abused its discretion." *Mathis v. Mathis*, No. 01-17-00449-CV, 2018 Tex. App. LEXIS 10432, *7 (Tex. App.—Houston [1st Dist.] Dec. 18, 2018, no pet.) (mem. op.) (citing *Pickens v. Pickens*, 62 S.W.3d 212, 214 (Tex. App.—Dallas 2001, pet. denied)); *accord O'Carolan I*, 71 S.W.3d at 532. "When a sufficiency review overlaps the abuse-of-discretion standard, we engage in a two-pronged inquiry: (1) whether the trial court had sufficient information to exercise its discretion and (2) whether the trial court erred in its application of discretion." *Mathis*, 2018 Tex. App. LEXIS 10432, at *7 (citing

*Sandone v. Miller-Sandone*, 116 S.W.3d 204, 206 (Tex. App.—El Paso 2003, no pet.)). "The traditional sufficiency review comes into play under the first prong." *Id.*

In a divorce decree, a trial court must "order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code § 7.001; *see Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018) (defining "just," "right," and "due regard" and describing abuse of discretion standard for reviewing trial court's division of marital estate). The division must be equitable, but the trial court does not have to divide the marital estate equally. *Murff*, 615 S.W.2d at 698–99. If there is a reasonable basis for an unequal division of the property in the record, the trial court has not abused its discretion. *See id.*; *O'Carolan I*, 71 S.W.3d at 532 (explaining that trial court's discretion is not unlimited and that there must be a reasonable basis for division). In exercising its discretion, the trial court "is empowered to use its legal knowledge and its human understanding and experience" and "has the opportunity to observe the parties on the witness stand, determine their credibility, [and] evaluate their needs and potentials, both social and economic." *Murff*, 615 S.W.2d at 698–99. The trial court may consider many factors including the spouses' earning capacities, disparity of income and abilities, education, business opportunities, relative physical condition, relative financial condition, disparity of ages, size of separate estates, nature of the property, and the benefits that the spouse who did not cause the breakup of the marriage would have enjoyed had the marriage continued. *Id.* "The circumstances of each marriage dictate what factors should be considered in division of the marital estate." *Roberts v. Roberts*, 531 S.W.3d 224, 232 (Tex. App.—San Antonio 2017, pet. denied) (citing *Young v. Young*, 609 S.W.2d 758, 761 (Tex. 1980)).

*No-fault Divorce*

In his first issue, William argues that because the trial court granted the divorce without fault and refused to hear William's evidence about fault, the trial court could not rely on fault to support the disproportionate division of the marital estate. As part of this issue, he challenges the trial court's Finding of Fact No. 24 and Conclusion of Law No. 3:

> Finding of Fact No. 24. As an additional consideration, the trial court awarded [Kimberley] a disproportionate share of the marital estate due to [William's] extramarital relationship with one of [Kimberley's] friends.
>
> Conclusion of Law No. 3. The trial court properly considered [William's] extramarital relationship with [Kimberley's] friend, and the disparate earning capacities of the parties, in awarding a disproportionate share of the marital estate.

He also expressly challenges as irrelevant the trial court's identical Findings of Fact Nos. 15 and 19 that "[t]he separation of the parties occurred shortly after [Kimberley] learned [William] was having an extramarital relationship with one of her friends." William argues: (i) "[i]t was an abuse of discretion to find fault on William's part after refusing to hear his evidence, assuring him the court would not find fault, and granting the divorce without fault," and (ii) the trial court "effectively prevented William from protesting or making an offer of proof on Kimberley's fault and William's rebuttal evidence to his fault because William trusted the Court's word that fault would not factor into the division." William relies on the trial court's statements concerning a chambers conference that occurred prior to the final hearing that they were not doing fault "because we agreed to go forward today."[5]

---

[5] William initially sought divorce on the ground of insupportability, but he amended his petition shortly before the final hearing to include adultery as an alternative ground for divorce. Although Kimberley also filed a first amended counterpetition for divorce shortly before the final hearing, Kimberley sought divorce based on adultery, cruelty, and insupportability in her original counterpetition. William filed an objection to her amended counterpetition, and

That the trial court granted the parties a no-fault divorce, however, is not inconsistent with and did not preclude it from considering William's admitted extramarital affair in its division of the marital estate. *See* Tex. Fam. Code § 6.001 (providing that trial court "may grant a divorce without regard to fault if the marriage has become insupportable"); *Mohindra v. Mohindra*, No. 14-06-00056-CV, 2007 Tex. App. LEXIS 8351, at *7 (Tex. App.—Houston [14th Dist.] Oct. 23, 2007, no pet.) (mem. op.) ("Courts, including this one, have acknowledged that fault may be considered [as factor in dividing marital estate] even in the context of a no-fault divorce."); *In re Brown*, 187 S.W.3d 143, 145–46 (Tex. App.—Waco 2006, no pet.) (concluding that trial court has discretion to consider "proven fault" in division of property regardless of basis for granting divorce (citing *Phillips v. Phillips*, 75 S.W.3d 564, 575–76 (Tex. App.—Beaumont 2002, no pet.) (Gaultney, J., concurring))); *Goodfellow v. Goodfellow*, No. 03-01-00633-CV, 2002 Tex. App. LEXIS 8809, at *14 (Tex. App.—Austin Dec. 12, 2002, no pet.) (mem. op.) (stating that "fault may be considered by a court in making a property division"); *but see Phillips*, 75 S.W.3d at 572 (concluding in plurality opinion that trial court may not consider fault in division of marital estate when "dissolution of marriage is sought <u>solely</u> on the ground of insupportability").

What is "just and right" in dividing the parties' estate is a separate determination from the ground for dissolving the marriage. *See* Tex. Fam. Code §§ 6.001–.007 (listing available grounds that court "may grant a divorce"), 7.001; *In re Mozley*, No. 06-16-00004-CV, 2016 Tex. App. LEXIS 8767, at *6–7 (Tex. App.—Texarkana Aug. 12, 2016, no pet.) (mem.

Kimberley filed a motion to strike his amended pleading to the extent he sought divorce based on adultery and a disproportionate division of the parties' estate, and she sought a motion for continuance based on William's amended pleading with "four novel claims less than four days prior to the Final Trial." It is in this context that the trial court referenced that they were not doing fault because they had agreed to proceed with the trial.

op.) (discussing grounds for dissolution and explaining that court does not abuse its discretion by granting no-fault divorce when there is evidence of "both insupportability and adultery").

As to William's argument that the trial court prevented him from cross examining Kimberley about her role in breaking up the marriage, "her extramarital affairs," and the parties' alleged agreement to date people outside the marriage, he did not make an offer of proof that would allow this Court to assess whether the exclusion of this evidence was erroneous and harmful. *See* Tex. R. App. P. 33.1(a) (stating prerequisites for preserving appellate complaints); Tex. R. Evid. 103(a) (generally requiring party, when trial court's ruling excludes evidence, to inform court of substance of excluded evidence by offer of proof); *In re Rangel*, 580 S.W.3d 675, 680 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (explaining that offer of proof "must include 'the meat of the actual evidence' rather than a general, cursory summary, so that the appellate court can meaningfully assess whether the exclusion of the evidence was erroneous and harmful"); *Triesch v. Triesch*, No. 03-15-00102-CV, 2016 Tex. App. LEXIS 2365, at *17 (Tex. App.—Austin Mar. 8, 2016, no pet.) (mem. op.) (concluding that appellant failed to preserve error because there was no evidence in record "to establish the content of the excluded statements"). We cannot presume that Kimberley's answers to questions about an extramarital affair or an agreement to date other people would have been favorable to William.[6] *See Vautrain v. Vautrain*, 646 S.W.2d 309, 312 (Tex. App.—Fort Worth 1983, writ dism'd) (concluding that court cannot presume that evidence of fault would have entitled party to greater portion of

---

[6] In his reply brief, William argues that the trial court's action of ruling before trial that there would be no fault and then considering fault in dividing the parties' estate is "akin to a procedural due process violation" and that the trial court unfairly denied him the right to introduce evidence on fault. But William did not raise this due process argument with the trial court, *see* Tex. R. App. P. 33.1(a) (stating prerequisites for preserving appellate complaints), and he could have made an offer of proof, *see id.*; Tex. R. Evid. 103(a), but did not do so.

community property because there was no "bill of exceptions made with respect to any evidence of fault excluded by the courts which appellant claims harmed her and perhaps affected the division of the parties' community estate").

As support for his position that the trial court abused its discretion, William relies on *Kaftousian v. Rezaeipanah*, 511 S.W.3d 618 (Tex. App.—El Paso 2015, no pet.). In that case, our sister court reversed the trial court's disproportionate division of the marital estate, concluding that the trial court had abused its discretion because the division was "so unjust and unfair." *Id.* at 623–24. Like the parties here, the spouses' main asset in that case was their marital home, they were both living paycheck to paycheck, and the court granted a no-fault divorce. *Id.* at 622–23. But "[t]he circumstances of each marriage dictate what factors should be considered in division of the marital estate," *Roberts*, 531 S.W.3d at 232, and it is the role of the trial court, as the factfinder, to evaluate the particular circumstances of a marriage and the parties' "needs and potentials," *see Murff*, 615 S.W.2d at 700 (noting that trial court, as factfinder, observes parties, determines credibility, and evaluates their "needs and potentials"). In *Kaftousian*, the party who was awarded the equity in the marital home earned more than the other spouse, and there was no evidence of fault before the trial court. 511 S.W.3d at 622–23. In contrast, William admitted to the extramarital affair and the evidence showed that although the parties were living paycheck to paycheck, William earned significantly more than Kimberley.

Because we cannot conclude that the trial court abused its discretion in considering fault in its division of the marital estate, we overrule William's first issue.

11

*Post-Divorce Spousal Maintenance*

In his second issue, William argues that the trial court could not grant post-divorce spousal maintenance in the form of a disproportionate division of the marital estate because it did not make the necessary findings to satisfy the statutory elements or to rebut the presumption against maintenance in the Texas Family Code and that it was an abuse of discretion to award spousal maintenance "in any form." *See* Tex. Fam. Code §§ 8.051(2)(b) (providing that trial court may award post-divorce spousal maintenance if duration of marriage was ten years or longer and spouse seeking maintenance lacks ability to earn sufficient income to provide for minimum reasonable needs), .053 (stating that it is rebuttable presumption that maintenance under section 8.051(2)(b) "is not warranted unless the spouse seeking maintenance has exercised diligence" in earning sufficient income to meet "minimum reasonable needs" or developing necessary skills to provide for "minimum reasonable needs during a period of separation and during the time the suit for dissolution of the marriage is pending").

As part of this issue, William challenges Conclusion of Law No. 3, which is recited above, as well as Finding of Fact No. 23 and Conclusion of Law No. 2:

> Finding of Fact No. 23. The trial court did not award [Kimberley] post-divorce maintenance. The trial court found that [William] did not have sufficient cash flow, especially in light of debt he was receiving, to support an award of spousal maintenance. Instead, the trial court incorporated [Kimberley's] claim for spousal maintenance in the division of the community assets and debts, awarding [Kimberley] a disproportionate share of the marital estate. In furtherance of that objective, the trial court awarded [Kimberley] the marital residence and assigned [William] the majority of the debt.

> Conclusions of Law No. 2. The trial court's decision to deny [Kimberley's] request for post-divorce maintenance and award [her] a disproportionate share of the marital estate was within the court's discretion.

12

William contends that "there is insufficient evidence and no finding that Kimberley lacked the ability to provide for her minimum reasonable needs," that the evidence showed that both parties were living paycheck to paycheck, and that "[i]t does not make sense to award a disproportionate division based on one party's lack of earning ability when she is earning just fine and they actually both live paycheck to paycheck."

The trial court, however, expressly found that it was not awarding spousal maintenance and did not order William to make payments to Kimberley going forward. *See* Tex. Fam. Code §§ 8.052, .054, .055. Further, the factors that a trial court may consider in its division of the marital estate include the parties' disparity of income and abilities, education, and relative financial condition. *See Murff*, 615 S.W.2d at 698–99; *see id.* (noting that trial court as factfinder evaluates parties' "needs and potentials"). William was an "audio, video design engineer" and had an associate degree "as a computer technician," earning approximately $85,000 annually, and Kimberley was approximately three years away from completing the course work for a college degree through a program with her employer and was earning approximately $30,000 annually. The trial court also assigned her the approximate $180,000 of debt on the home, increasing her monthly out-of-pocket expenses going forward. On this record, we cannot conclude that the trial court abused its discretion in denying Kimberley's request for post-divorce spousal maintenance but awarding a disproportionate division of the parties' estate to her. We overrule William's second issue.

*Disproportionate Division of Marital Estate*

In his third and fourth issues, William argues that the property division was "so grossly disproportionate as to be inequitable and constitute an abuse of discretion"; that the

13

divorce decree "gives no reason for a disproportionate division of assets, but in it, the court gave [Kimberley] at least $11,000 in assets and [William] $28,000 in debts"; and that it is an abuse of discretion to award a disproportionate share of the marital estate "without cause." He further contends that the trial court "based its numbers in part on unsubstantiated sua sponte speculations that the equity [in the marital home] should be discounted for commissions" and that "[r]emoving the $20,000 the court subtracted for speculations, Kimberley actually received at least $31,000 to William's $-28,000."[7] During the final hearing, the trial court initially advised the parties that it "was going to find there's approximately $35,000 in liquid equity" in the marital home but after Kimberley's testimony about necessary repairs, advised them that it had reduced the value to $25,000.

As part of these issues, William challenges the trial court's Finding of Fact No. 9 and its Conclusion of Law No. 1:

> Finding of Fact No. 9. Based on the agreed market value, the balance on the mortgage, the amount and description of needed repairs, and the anticipated transaction costs related to any potential sale of the house, the trial court determined that there was $25,000 in equity in the marital residence. [William] agreed with discounting the amount of equity based on the needed repairs and potential transaction costs associated with any future sale.

> Conclusion of Law No. 1. Based on the evidence and testimony at the final hearing, the trial court's division of the community assets and debts in the parties' marital estate was just and right.

*See* Tex. Fam. Code § 7.001; *Bradshaw*, 555 S.W.3d at 543 (defining "just," "right," and "due regard" in context of division of marital estate). William argues that Finding of Fact No. 9 is "unsupported by the evidence" and that "[t]here was no evidence that would uphold such a gross

---

[7] William arrives at $20,000 by deducting $180,000 (the amount of debt), $25,000 (the amount of equity), and $15,000 (the cost of repairs) from $240,000 (the home's market value).

disproportionate division of the marital estate" in that Kimberley "received a net asset of between $32,000 and $12,000 (in the light most favorable to the verdict) while William received a net *debt* of $28,000."[8] William also challenges the trial court's Finding of Fact No. 22 to the extent it states that $12,500 represents fifty percent of the equity in the marital home.[9]

As support for his calculations, William argues that the trial court valued the equity in the marital home incorrectly because the "maximum number in evidence for repairs was $15,000" and "[t]here was no evidence of commissions, if any, or their cost." He also argues that the trial court reduced the equity in the marital home by $35,000 based in part on the court's "personal guess at how much commissions would cost." Although he agreed with the trial court during trial that the value of the home was $240,000 minus transaction and fix-up costs, *see Berlet v. Berlet*, No. 11-14-00079-CV, 2016 Tex. App. LEXIS 3358, at *11 (Tex. App.—Eastland Mar. 31, 2016, no pet.) (mem. op.) (explaining that "[a]s a general rule, the value to be accorded community property that is to be divided in a divorce proceeding is market value" and defining fair market value), he argues that "[t]his does not show [his] agreement to

---

[8] The trial court assigned $26,500 in credit card debt and $14,000 in contingent student loan debt to William.

[9] The trial court's other findings of fact as to the marital home, which William does not challenge, were:

> Finding of Fact No. 6. At the time of the final hearing, the marital residence was in need of significant repairs. The roof needed repairing, the windows were not working properly, the house needed painting, there were various repair projects unfinished, the balcony was in a state of disrepair, and there was a hazardous drop off outside one of the doors.

> Finding of Fact No. 7. The tax assessed value of the residence was $240,000. The parties agreed the market value of the residence was $240,000.

> Finding of Fact No. 8. At the time of the final hearing, approximately $180,000 was owed on the house.

15

the court's speculation as to what those costs might be, much less that the transaction costs would somehow add up to $20,000 when the seller [Kimberley] is a realtor."

We agree with William that the parties did not present evidence that quantified the amount of potential real estate commissions or closing costs and that Kimberley estimated that it would cost around $15,000 to repair the home to make it marketable. The trial court, however, reasonably could have inferred that these costs would have been significant from Kimberley's testimony that if the necessary repairs were made to the home and it was sold, there was not going to be much left over after closing costs. Further, even if the trial court improperly reduced the value of the marital home by too large an amount for potential commissions and transaction costs, we cannot conclude that this reduction had a material effect on the trial court's division of the marital estate as a whole. *See* Tex. Fam. Code § 7.001; *Murff*, 615 S.W.2d at 698–98 (looking to division of marital estate as whole and observing that mathematical precision is usually not possible); *In re O'Brien*, 436 S.W.3d 78, 83 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting that appellate court looks to division of marital estate as "whole" to determine whether division was equitable, just, and right); *see also In re McFarland*, 176 S.W.3d 650, 660 & n.8 (Tex. App.—Texarkana 2005, no pet.) (concluding that trial court did not abuse its discretion in awarding proceeds of home to wife and explaining that trial court arrived at estimated amount of proceeds "by assuming the residence would sell at the appraised value, then the court deducted what it believed would be a realtor's standard commission from the equity balance"). Because Kimberley was obligated to either refinance or sell the home, she was going to incur some transaction costs as well as repair costs on the home. As the trial court explained to the parties during the hearing, assessing the value of a home is "not a precise science," homes are not liquid assets, and "if you do sell a home, you have to do some things,

16

typically, and there's real estate commissions, typically." *See Murff*, 615 S.W.2d at 698–700 (observing that "[m]athematical precision in dividing property in a divorce is usually not possible"; that trial court, as factfinder, "is empowered to use its legal knowledge and its human understanding and experience"; and that trial court may consider nature of marital property as factor in dividing marital estate). And although William agreed that there would be some amount of "transaction costs," he did not provide evidence of what those costs would be. *See, e.g.*, *Deltuva v. Deltuva*, 113 S.W.3d 882, 887 (Tex. App.—Dallas 2003, no pet.) (noting that generally party who does not provide trial court with value of property cannot complain on appeal about trial court's lack of information to properly divide property).

We observe that the trial court concluded that it had cause for its division—William's extramarital relationship and the parties' disparate earning capacities—and based on the evidence before it, it reasonably could have found significant the disparity of the parties' earning capacities and their financial condition. William earned approximately $85,000 annually, which was significantly more than what Kimberley made; he no longer would be paying the mortgage on the marital home after the divorce; and although he testified that he would be paying rent in the amount of $1,000 going forward, he had not made any rent payments during the parties' separation. *See Goodfellow*, 2002 Tex. App. LEXIS 8809, at *14 (stating that "disparity in the financial condition and earning capacities of the parties is an important factor in dividing their estate" (citing *Murff*, 615 S.W.2d at 699)). Further, in addition to the $12,500 that the trial court awarded to him, William was awarded the parties' dog Luke.[10] *See Murff*, 615 S.W.2d at 698–99 (allowing court to consider nature of property in property division); *see,*

---

[10] William was also awarded other tangible personal property including two vehicles, tools, his bank account with a balance of around $1,000, a concrete mixer, and a welder.

17

*e.g.*, *Strickland v. Medlen*, 397 S.W.3d 184, 185 (Tex. 2013) (acknowledging that "Texans love their dogs" and that "canine companions are treated—and treasured—not as mere personal property but as beloved friends and confidants, even family members").

The evidence further showed that: (i) Kimberley had limited credit; (ii) the home needed immediate repairs for "health and safety" reasons whether it was sold or not[11]; (iii) she was assigned and required to refinance approximately $180,000 of debt on the marital home or to sell it; and (iv) although she was pursuing a degree through her employer, she had several more years to complete her degree's requirements. *See Goodfellow*, 2002 Tex. App. LEXIS 8809, at *14 (noting that "one spouse's future need for further support may be considered in the division"). As to the debt that the trial court assigned to William, in addition to the disparity in the parties' earning capabilities, the trial court reasonably could have discounted the student loan debt because it was a contingent liability. William will be required to pay that debt only if his children default on their loans.

Reviewing the trial court's division of the marital estate as a whole, we cannot conclude that any error by the trial court in discounting the equity in the marital home for potential real estate commissions, closing costs, or transaction costs had a material effect on the trial court's just and right division of the marital estate that would warrant reversal. *See Richard v. Towery*, No. 01-11-00132-CV, 2013 Tex. App. LEXIS 4813, at *33 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.) (noting that "the percentages calculated by trial court need not be perfect—minor variances in the math, if any, do not amount to reversible error as long as they are not material in light of the community estate as whole"). Further, we cannot

---

[11] As to necessary repairs for the marital home to address health and safety concerns, Kimberley testified that they "would 100 percent have to be addressed before the home would be sold because nobody would be able to get a loan with it in that condition."

18

conclude that the property division was "so grossly disproportionate as to be inequitable and constitute an abuse of discretion." *See O'Carolan I*, 71 S.W.3d at 532 (stating that property division must be manifestly unfair to constitute abuse of discretion). Thus, we cannot conclude that the trial court abused its discretion in its division of the marital estate in favor of Kimberley and overrule William's third and fourth issues.

## CONCLUSION

Having overruled William's issues, we affirm the trial court's final decree of termination.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:   December 22, 2022